

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### November 16, 2016 Session

## STATE OF TENNESSEE v. JAMIE PAUL CLICK

**Appeal from the Circuit Court for Sevier County**
**No. 18116-II     Richard R. Vance, Judge**

_____

### No. E2015-01769-CCA-R3-CD

_____

The Defendant, Jamie Paul Click, was convicted of one count each of selling heroin within a drug-free school zone, delivering heroin within a drug-free school zone, and casually exchanging marijuana; and two counts each of delivering heroin and selling heroin. The trial court merged the three delivery convictions with the corresponding sale convictions and imposed an effective sentence of eighty years' incarceration. In this appeal as of right, the Defendant raises challenges to the following: (1) the trial court's refusal to sever the offenses, contending that each drug deal should have been tried separately because his conduct was not part of a common scheme or plan and, additionally, that evidence of the drug-free school zone deal was prejudicial to the other counts; (2) the sufficiency of the convicting evidence supporting his various convictions for sale and delivery of heroin, arguing that all of the transactions were merely casual exchanges and that there was inadequate proof that the one transaction occurred within a drug-free school zone; and (3) various aspects of the trial court's sentencing decision, including the Defendant's range classification, the length of his sentences, the imposition of consecutive sentences, and the subsequent denial of his motion to reduce his total effective sentence.[1] Following our review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Wesley D. Stone, Knoxville, Tennessee, for the appellant, Jamie Paul Click.

---

[1] For the sake of clarity, we have renumbered and reordered the issues as stated by the Defendant in his brief.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; James B. ("Jimmy") Dunn, District Attorney General; and George C. Ioannides, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

This case relates to controlled drug purchases conducted by the Sevierville Police Department ("SPD") in September 2012. Thereafter, the Defendant was charged with alternate counts of selling and delivering heroin on September 5, 2012, within a drug-free school zone (Counts 1 and 2), Class A felonies; one count of casually exchanging marijuana on September 10, 2012 (Count 3), a Class A misdemeanor; alternate counts of selling and delivering heroin on September 10, 2012 (Counts 4 and 5), Class B felonies; and alternate counts of selling and delivering heroin on September 11, 2012 (Counts 6 and 7), likewise Class B felonies. See Tenn. Code Ann. §§ 39-17-417, -418, -432. The Defendant proceeded to a jury trial.

At trial, Eric Blalock testified that, in 2012, he ran into the Defendant, whom he had known for "[a]t least fifteen" years, at Sunoco gas station, and a conversation ensued. Mr. Blalock said that, during their talk, the Defendant asked him if he was "messing with anything at the time[,]" which Mr. Blalock understood to mean "[d]oing any drugs or anything." The men exchanged telephone numbers and went their separate ways. A couple of days later, Mr. Blalock "was needing to make some money[,]" so he started working with the SPD as a "cooperating individual" ("CI"). According to Mr. Blalock, he had been offered this opportunity to work as a CI when his "wife was picked up on a theft charge" and the authorities asked him "if [he] could help them out." Mr. Blalock confirmed that he was paid for his services, approximately $100 per buy.

Detective Josh Turner was employed with SPD as a narcotics investigator in 2012. He testified that he began working as an investigator approximately two years prior to that time. He also had seven years of previous experience as a narcotics investigator with the Knox County Sheriff's Department. According to Det. Turner, he would often use CIs in narcotics investigations, and it was customary for CIs to get paid or receive help on pending charges in exchange for their services.

Det. Turner testified that, in "street level" drug transactions, typically only "smaller amounts" of drugs were purchased for personal use and small purchases were made frequently once money became available. Det. Turner also said that "street level dealers" did not usually carry large amounts of drugs on their person, especially when making deals. This, according to Det. Turner, was because they were afraid of being arrested while in possession of a large amount of drugs. When asked why the police might not arrest someone immediately for selling drugs, Det. Turner replied, "[W]e'll do

-2-

several buys to show that they are a drug dealer and they're just not doing it to help a friend out or doing favors[.]" The police, Det. Turner testified, may also be "try[ing] to find out where they're supplied."

Det. Turner confirmed that Mr. Blalock and his wife, who was "being looked at on a charge" by the "Criminal Investigation Division[,]" contacted him in 2012, and he set up a meeting with the couple. At the meeting which followed, Det. Turner enrolled Mr. Blalock as a CI, and it was agreed that Mr. Blalock would be paid for services. According to Det. Turner, Mr. Blalock was unemployed and staying with his grandfather at the time of the meeting. Det. Turner testified that he used Mr. Blalock "in a number of investigations" over a period of three or four years and that Mr. Blalock was compensated approximately $2600 in total for his work.

An undercover investigation, Det. Turner said, began with the CI's identifying a possible "target" from whom they could buy drugs. After the target had been identified, the CI would place a recorded phone call to that individual "to see if they [could] purchase anything that day to see if they have anything." If a purchase was imminent, Det. Turner met with the CI. Det. Turner explained that the CI was searched along with any vehicle driven by the CI and that the CI was then provided with photographed money to purchase the drugs. According to Det. Turner, the CI was also outfitted with a "wire," allowing the police to listen to the transaction as it was taking place, and a "recording device," capturing either a video or audio recording of the drug deal. Once the purchase was consummated, the CI returned to the officers, turned over the drugs, and was searched again.

The first controlled purchase of heroin involving the Defendant and Mr. Blalock occurred on September 5, 2012. On that day, Mr. Blalock, under police supervision, called the Defendant and arranged to meet at a local Kroger to purchase a small quantity of heroin. Following the procedure previously detailed, Det. Turner prepared Mr. Blalock for the transaction. Thereafter, Det. Turner, in a vehicle being driven by Tennessee Bureau of Investigation ("TBI") Agent Greg McNamara, followed Mr. Blalock to the Kroger parking lot. Assisting Det. Turner with the controlled purchase that day were Agents Steve Kitts, Norton,[2] and McNamara.

After waiting in the Kroger parking lot a while, Det. Turner requested that Mr. Blalock call the Defendant to see if he still planned on coming. The Defendant answered Mr. Blalock's call and said that he was "parked behind the Clarion Inn, that he was having truck trouble." The Defendant told Mr. Blalock that he was driving a red Chevy truck, which Det. Turner later determined was registered to a "Jeff Click." Upon Det. Turner's directive, Mr. Blalock began driving towards the Clarion Inn, but just as Mr.

---

[2] The first name of Agt. Norton is not apparent from the record.

Blalock was leaving Kroger, Heather Arwood phoned Mr. Blalock and told Mr. Blalock to meet the Defendant at the Taco Bell on Winfield Dunn Parkway instead of at the Clarion Inn. All parties proceeded towards the Taco Bell.

Det. Turner observed Mr. Blalock pull his vehicle into the "Exxon/Taco Bell area." So as not to be suspicious, Agt. McNamara and Det. Turner continued driving past the Taco Bell. After quickly turning around and heading back for the Taco Bell, Det. Turner saw Mr. Blalock's truck parked next to a red Chevy truck and the Defendant "standing outside between the two vehicles." Mr. Blalock testified that the Defendant exited his truck and got inside the passenger side of Mr. Blalock's vehicle. According to Mr. Blalock, they then exchanged $25 for a small bag containing a powdery substance, which was later determined to be 0.05 grams of heroin. As Agt. McNamara and Det. Turner were entering the Exxon pulling up to the gas pump, the Defendant's truck was heading "right at" them, and Det. Turner was able to identify the Defendant and Ms. Arwood as the truck's occupants. The Defendant could be heard on the recording device during this transaction instructing Mr. Blalock on how to use the heroin intravenously; telling Mr. Blalock that he should like the heroin better than "R," meaning Roxicodone, and that heroin's effects last longer; and informing Mr. Blalock that, if Mr. Blalock wanted to ride with the Defendant to his supplier, Mr. Blalock would be able to buy ten bags of heroin for $120.

Ms. Stacey Whaley, the director of Sevier County Geographical Information Systems ("GIS"), testified about the maps she created showing the area where the September 5, 2012 transaction occurred and averred that they accurately reflected how the property looked in 2012. For the Defendant's trial, she created several maps providing aerial views of Taco Bell and Cattlesburg Elementary School with parcel lines drawn.[3] In several of the maps, the elementary school can be seen nearby to the northwest of the restaurant. Ms. Whaley stated that Sevier County School Board owned two tracts of land involving Cattlesburg Elementary—the initial tract of land being the school and school's grounds ("Tract 3"), and the second parcel was a right-of-way that was later deeded to the school board and that was the primary method of ingress and egress from the school, including the route travelled by school buses. Two certified deeds governing these parcels were entered into evidence. Also two certified maps

---

[3] Ms. Whaley was qualified as "an expert to use ArcGIS software to draw maps and give opinions about how to interpret the maps and using the data to plot the maps." She testified that the maps were created using the following process: "We input the data, the parcel line that we received from the property assessor's office into our system and add the aerial photography from T[ennessee] D[epartment] O[f] T[ransportation] and create a map that you can physically see property lines and aerial photography." This was Ms. Whaley's first time to testify in a court of law. She was thoroughly questioned about how the maps were prepared.

depicting the parcels in the area comprising "United Commercial Park," which included both the school and restaurant, were made exhibits.

Det. Turner identified one of the aerial view maps and stated that the map "fairly and accurately reflect[ed] the geography on the day that this drug transaction occurred" between Mr. Blalock and the Defendant. Det. Turner placed an "X" on the map signifying the location of the drug deal, which was near a median in the "parking area between the Taco Bell and the Exxon[.]" Agt. McNamara also identified this location.

Utilizing a measuring wheel, Det. Turner physically calculated the distance from the drug transaction's location, which location he designated as location number one, to several different places inside the school's boundaries. The first measurement was 185 feet from the where the drug deal occurred and was marked by a cone numbered two. Det. Turner also notated cone two on the aerial map, which was inside the school's right-of-way parcel. A photograph of cone two showed its location in a field directly across from the Taco Bell parking lot. Another photograph from cone two looking towards the school showed the school's main entrance road and the Cattlesburg Elementary School's sign. Location number three was directly in front on the school sign, and the distance to location three from the drug deal was 250 feet, according to Det. Turner. A cone marked number four was placed further up the entrance road at a distance measuring 500 feet from location one. Location one in the Taco Bell parking lot can be seen in a photograph taken from cone four. Next, Det. Turner stated that a cone designated number five was placed on the entrance road 750 feet from location one. The Taco Bell and Exxon were no longer visible in a photograph taken from cone five. Finally, Det. Turner marked the distance of 1000 feet from the drug deal's location with a cone labeled number six, which location "was pretty much right at the intersection of United Boulevard and the entrance to the school." There was a stop sign facing United Boulevard at this intersection. In a photograph looking towards the school from cone six's location, the elementary school and a gate in front of the school on the entrance road can clearly be seen. Det. Turner also noted cone six on the aerial map, and cone six was inside Tract 3, the initial tract of land comprising the school and school's grounds. All previously numbered locations were on the school's right-of-way parcel.

SPD school resource officer Tim Russell testified that he routinely patrolled the school's grounds, including the right-of-way, and that the school board maintained the right-of-way. When considering ownership of the school's right-of-way, the drug deal, Ofc. Russell said, took place within about 150 feet from the school property line. Ofc. Russell also stated that the "gate across the driveway" was only used when the school was on "full lockdown." The gate's location on the school's property was further than 1000 feet from where the transaction occurred in the Taco Bell parking lot.

Returning to the ongoing narcotics investigation, Det. Turner described a second controlled-buy attempt by Mr. Blalock to purchase heroin from the Defendant on September 7, 2012. Mr. Blalock again telephoned the Defendant. On the recordings, the Defendant can be heard asking Mr. Blalock how he liked the heroin from "the other day," affirming that heroin was better because it lasted longer and was cheaper than pills, stating that he was going to "make a run here in a minute" to obtain more drugs, and inquiring how many bags of heroin Mr. Blalock wanted. Ultimately, the Defendant stated that his supplier was "stalling" him, and no drug purchase took place that day.

On September 10, 2012, Mr. Blalock, once more under police supervision, called the Defendant trying to buy heroin. The Defendant said that "he would have some bags later on but then he asked [Mr.] Blalock to sell some of that good strawberry kush for him." According to Det. Turner, strawberry kush was a strain of marijuana. Mr. Blalock told the Defendant that he would call him back after making some phone calls "to see if he would be able to help [the Defendant] get rid of some of" the marijuana. Det. Turner told Mr. Blalock to go ahead and buy the marijuana from the Defendant. They arranged to meet at a local Walmart, with the understanding that the Defendant would obtain heroin to sell Mr. Blalock later that day. After following the same established procedure for CI drug buys, Det. Turner dropped Mr. Blalock off at the Walmart and observed the drug deal from a parked car. Det. Turner testified that he saw the Defendant arrive with Ms. Arwood in a red Mustang, which was registered to Ms. Arwood. When the couple parked, Mr. Blalock went to the passenger-side window of the Mustang and bought marijuana from the Defendant, trading $75 for 5.08 grams of marijuana. The Defendant said to Mr. Blalock that he "wished [he] knew" he was going to get this $75 for selling marijuana because he could have already bought more heroin from his supplier.

Later on September 10, Mr. Blalock called the Defendant to inquire about the status of the heroin. The Defendant stated that he was headed to Knoxville to get the heroin and asked Mr. Blalock if he could front the money for the heroin purchase. However, Mr. Blalock, upon Det. Turner's order, declined to give the Defendant money before he was in possession of the heroin. The Defendant stated that he understood and that he would call Mr. Blalock about forty-five minutes before he returned to the Sevierville area. Sometime later, they agreed to meet at a Pilot gas station.

Mr. Blalock was dropped off and waited for the Defendant "on the south side of the Pilot where there's a retaining wall." In order to observe the transaction, Agt. McNamara parked in the Pilot parking lot, and Det. Turner parked across the street. Eventually, the Defendant arrived as a passenger in the same red Mustang. Mr. Blalock went to the passenger side of the vehicle, paid the money the police provided, and received two bags of heroin, 0.07 grams in total, from the Defendant. On this occasion, Mr. Blalock noticed that the Defendant had six other small bags of heroin in his lap.

Det. Turner described a final controlled drug buy on September 11. For this controlled purchase of heroin, the same procedures were followed, and Mr. Blalock arrived at the predetermined meeting location, a Chick-fil-A restaurant. The Defendant chose the Chick-fil-A over Walmart because the Defendant "was worried about the cameras in front of Walmart." Again, the Defendant arrived as a passenger in the same red Mustang. Mr. Blalock purchased two more bags weighing 0.07 grams in total.

Mr. Blalock testified that each bag of heroin he bought from the Defendant was enclosed in the same light blue packaging. Furthermore, Mr. Blalock paid $50 each time for the two bags of heroin he purchased from the Defendant, although he unsuccessfully tried to negotiate a lower price. Furthermore, Mr. Blalock testified that he had no other interactions with the Defendant during the narcotics investigation, although he did have some social involvement with the Defendant after these transactions. Mr. Blalock testified that he "never hung out with" the Defendant prior to September 2012, explaining that he "had met [the Defendant] through [his] brother years before." Mr. Blalock confirmed that he was facing a new drug charge at the time of the Defendant's trial; however, Mr. Blalock said that he had not been promised any benefit in exchange for his testimony.

Following the presentation of evidence, the Defendant was convicted as charged. A sentencing hearing was held, and the trial court sentenced the Defendant to an effective eighty-year incarcerative sentence as a Range II, multiple offender. This appeal followed.

ANALYSIS

On appeal, the Defendant argues (1) that the trial court erred when it denied his motion for severance of offenses; (2) that the evidence was insufficient beyond a reasonable doubt to establish that he sold or delivered heroin, claiming that he was guilty of casual exchange instead, or to establish that the September 5, 2012 transaction occurred within 1000 feet of real property comprising an elementary school; and (3) that the trial court made sentencing errors, including classifying him as a Range II, multiple offender, imposing maximum sentences within each conviction's range, ordering consecutive sentences, and denying his subsequently filed motion to reduce his overall sentence pursuant to Rule 35 of the Tennessee Rules of Criminal Procedure. We will address each issue in turn.

*I. Motion to Sever*

The State joined the various drug deals by charging the offenses in the same presentment. Prior to trial, the Defendant filed a motion to sever each transaction by date; a motion that the trial court denied after a hearing. After the jury trial, the

Defendant was found guilty of alternate counts of selling and delivering cocaine on September 5, 2012, within a drug-free school zone (Counts 1 and 2); one count of casually exchanging marijuana on September 10, 2012 (Count 3); alternate counts of selling and delivering cocaine on September 10, 2012 (Counts 4 and 5); and alternate counts of selling and delivering cocaine on September 11, 2012 (Counts 6 and 7).

On appeal, the Defendant argues that the trial court erred by denying his motion to sever Counts 1 and 2; from Counts 3, 4, and 5; and all of the preceding counts from Counts 6 and 7, alleging that three separate trials should have been held. In support of his argument, he asserts that the separate drug transactions on three different dates were not part of a common scheme or plan and that evidence of each drug transaction would not have been admissible in the trial of the others, resulting in "bad act evidence" being introduced to buttress each drug buy. Furthermore, the Defendant submits that he was unfairly prejudiced by the introduction of the school zone evidence pertaining to Counts 1 and 2 where the subsequent transactions did not include school zones. The State responds that each drug deal was part of a larger, continuing plan and that the evidence of the various offenses would have been admissible in the trials of the others to prove the Defendant's intent.

At the motion to sever hearing, Det. Turner testified concerning the three separate drug deals occurring on September 5th, 10th, and 11th of 2012, and about the unsuccessful attempt to purchase drugs on September 7, 2012. At the conclusion of Det. Turner's testimony, the Defendant, noting the "different weights, different quantities[,] and different drugs on different dates[,]" made the following argument:

> And so it's our position, . . . while we don't necessarily agree that these offenses are part of a common scheme or plan, that they would not be admissible in the trial of the other. . . . [I]t's [the Defendant's] position that it would be a violation of Rule 404 of the Tennessee Rules of Evidence to allow prior bad acts allegedly occurring on September the 5th and September the 10th in a trial for things occurring on September 11th. And equally so as it relates to September the 10th and September the 5th. So it's our position that they're not admissible at the trials of each other for the reasons of 404(b), but particularly the standards set forth

in Tennessee Rule of Criminal Procedure 14(b)(1). The State responded that

> the evidence of the things that occurred on the 7th and the 10th and the 11th would prove the [D]efendant's intent, lack of mistake, and those various items for the transaction on the 5th. And likewise, the things that happened on the 5th, the 7th and 11th, would do so for the 10th. So I think all of the evidence . . . would be admissible on that basis in a trial[.]

-8-

The trial court thereafter denied the motion to sever, reasoning as follows:

> In this case, the only fact [different] between the three events are the locations. The officer is the same. The [cooperating individual], the person making the buy, is the same. The defendant is the same. The drugs are the same, except the marijuana was used—that sale was used in order for the [D]efendant to be able to fund the purchase of the heroin, which was sold again. It appears to the [c]ourt that these three transactions were part of a very common scheme, plan, involving the same actors, the same type of drug, and it was part of a common plan, and that each would be admissible to the other to show the lack of any mistake, to show motive, to show intent, and the identity of this defendant.

A trial court's denial of a motion to sever is reviewed under an abuse of discretion standard. State v. Garrett, 331 S.W.3d 392, 401 (Tenn. 2011) (citing Spicer v. State, 12 S.W.3d 438, 442 (Tenn. 2000)). A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party. Id. (citing State v. Jordan, 325 S.W.3d 1, 39 (Tenn. 2010)). This court will also find an abuse of discretion when the trial court has failed to consider the relevant factors provided by higher courts as guidance for determining an issue. State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007).

Tennessee Rule of Criminal Procedure 8(b) provides that "[t]wo or more offenses may be joined in the same indictment" if the offenses are either (1) "parts of a common scheme or plan" or (2) "of the same or similar character."[4] However, Rule 14(b)(1)

---

[4] Tennessee Rule of Criminal Procedure 8 provides for two types of joinder of offenses: mandatory and permissive. Mandatory joinder is required when two or more offenses are "(A) based on the same conduct or arise from the same criminal episode; (B) within the jurisdiction of a single court; and (C) known to the appropriate prosecuting official at the time of the return of the indictment(s) . . . ." Tenn. R. Crim. P. 8(a)(1). The Defendant seemingly concedes that the State could have permissibly joined the separate drug buys pursuant to Rule 8(b). However, the State appears to imply in a footnote that mandatory joinder might have been appropriate in this case. We are constrained to agree with the Defendant this is not a case of mandatory joinder pursuant to Rule 8(a) because, based upon these facts, the underlying drug transactions were not all part of one criminal episode. See State v. Jamie N. Grimes, No. M2012-00530-CCA-R3-CD, 2013 WL 5761301, at *3-4 (Tenn. Crim. App. Oct. 22, 2013) (holding that the two offenses which occurred almost a month apart and at different locations were not part of the same criminal episode, even though the same cooperating individual was used in both cases); see also State v. Johnson, 342 S.W.3d 468, 475 (Tenn. 2011) (concluding that, for principles of mandatory joinder to apply, "the acts to be included in the same criminal episode must occur simultaneously or in close sequence and must occur in the same place or in closely situated places"). Moreover, we warn the State that the result it implies could be problematic in subsequent cases. The failure by the State to join all the "same conduct" or "same criminal episode" offenses in the original indictment prevents the State from

provides that if "two or more offenses are joined . . . pursuant to Rule 8(b), the defendant has the right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others." Accordingly, once a defendant makes a motion to sever or objects to a pre-trial consolidation motion by the State, "the trial court must consider the motion by the severance provisions of Rule 14(b)(1)" instead of the provisions of Rule 8(b). Garrett, 331 S.W.3d at 402 (quoting Spicer, 12 S.W.3d at 443). Upon a defendant's motion to sever, "the trial court must hold a hearing in order to gather the information necessary to adjudicate the issue." Id. at 403. The trial court must sever the offenses unless it can

> conclude from the evidence and arguments presented at the hearing that: (1) the multiple offenses constitute parts of a common scheme or plan; (2) evidence of [one] offense is relevant to some material issue in the trial of all the other offenses; and (3) the probative value of the evidence of other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant.

Id. (quoting Spicer, 12 S.W.3d at 445).

As our supreme court has previously stated, "a common scheme or plan for severance purposes is the same as a common scheme or plan for evidentiary purposes." State v. Moore, 6 S.W.3d 235, 240 n.7 (Tenn. 1999). For offenses to be considered part of a continuing scheme or plan, the crimes must be directed toward a "common goal or purpose." State v. Denton, 149 S.W.3d 1, 15 (Tenn. 2004) (quoting State v. Hoyt, 928 S.W.2d 935, 943 (Tenn. Crim. App. 1995)) (internal quotation marks omitted). This "requires proof of 'a working plan, operating towards the future with such force as to make probable the crime for which the defendant is on trial.'" State v. Allen Prentice Blye, No. E2001-01375-CCA-R3-CD, 2002 WL 31487524, at *5 (Tenn. Crim. App. Nov. 1, 2002) (quoting Hoyt, 928 S.W.2d at 943).

We agree with the trial court's assessment that the three sets of offenses, occurring within a one-week time period, all involving the same cooperating individual, same defendant, and his same companion, Ms. Arwood, were part of a common scheme or plan to sell and deliver heroin. The offenses also involved the same geographical area. Det. Turner testified that the buys involved virtually the same sequence of events. Except for the marijuana sale, each buy involved a similar amount of heroin. The money from the marijuana sale was used to purchase more heroin to sell to Mr. Blalock. This court has

---

subsequently prosecuting the other charges that should have been included in the original indictment unless the charges have been severed pursuant to Tennessee Rule of Procedure 14. See Tenn. R. Crim. P. 8(a)(2); Tenn. R. Crim. P. 8, Advisory Comm'n Cmt. (stating that charges that have been saved back "are barred from future prosecution if known to the appropriate prosecuting official at the time that the other prosecution is commenced, but deliberately not presented to a grand jury").

repeatedly acknowledged "common scheme or plans" involving drug transactions with similar factual patterns. See, e.g., State v. Garrick Graham, No. E2014-01267-CCA-R3-CD, 2016 WL 892013, at *6 (Tenn. Crim. App. Mar. 8, 2016) (concluding that the evidence—"[a]ll but one of the offenses in this case took place during a period of time from September 1, 2011, through October 24, 2011, and involved the same controlled substance, the same [cooperating individual], and either [the defendant or his co-defendant] or both"; the "offenses also involved the same area in Kingsport"; and an officer testified that "the buys involved virtually the same sequence of events"— established a larger continuing plan to supply the cooperating individual with progressively greater quantities of crack cocaine); Grimes, 2013 WL 5761301, at *3-4; State v. Patrick L. Maliani, No. M2012-01927-CCA-R3-CD, 2013 WL 3982156, at *12-13 (Tenn. Crim. App. Aug. 5, 2013) (holding that the "two offenses were part of a continuing criminal scheme" because the same cooperating individual sought to purchase drugs from the same seller, the defendant was present at both drug sales and acted as a look out on both occasions, and each time, a small quantity of crack cocaine was purchased); State v. Joseph Clyde Beard, Jr., No. 03C01-9502-CR-00044, 1996 WL 563893 (Tenn. Crim. App. Sept. 26, 1996) (finding "common scheme" where same individual purchased similar amounts of cocaine from the same defendant for the same amount of money in the same location although the drug transactions occurred a month apart); State v. Roger D. Pulley, No. 01C01-9501-CC-00013, 1995 WL 555060, at *2 (Tenn. Crim. App. Sept. 20, 1995) (concluding that a severance was inappropriate when the five drug offenses "[o]ccurred within eight weeks of one another and involved virtually the same sequence of events, the same [cooperating individual], and the same established procedure"); State v. Steve Mosley, No. 01C01-9211-CC-00345, 1993 WL 345542, at *4 (Tenn. Crim. App. Sept. 9, 1993) ("[I]n the case at bar, four of the indicted offenses occurred within a three-day period and the other occurred approximately six weeks later. All of the offenses involved the same controlled substance, the same defendant, the same [cooperating individual] and the same witnesses. It was such a continuous episode so closely related that the proof was essentially the same in each case."). Moreover, we note that there is no requirement that "each incident be identical to the previous one." Pulley, 1995 WL 555060, at *2.

The Defendant relies on State v. Reba Nell Woods, No. M2012-01922-CCA-R3-CD, 2013 WL 6406275 (Tenn. Crim. App. Dec. 9, 2013), in support of his argument that three separate transactions were not part of larger, continuing plan. In that case, a panel of this court held that "nothing indicated that the [defendant's] drug sales to [the cooperating individual] were part of a working plan with a readily distinguishable goal" but were "to the contrary, . . . simply a string of similar offenses." 2013 WL 6406275, at *12. But cf. State v. Donald Ray Blevins, No. M2009-00124-CCA-R3-CD, 2010 WL 1687736, at *6-8 (Tenn. Crim. App. Apr. 26, 2010) (concluding that multiple telephone calls setting up separate buys did evince a common scheme or plan). The present case is

readily distinguishable from <u>Woods</u>. In <u>Woods</u>, the cooperating individual made calls to the defendant and arranged to buy drugs from a third party. The dates of the various drug deals spanned over a month, and the defendant argued that she "did not have anything to do with the drug transactions[,]" even presenting testimony to that effect from one of the sellers. 2013 WL 6406275, at *1-8, *10. Here, the Defendant was present at every drug deal, all taking place within a one-week period, and he can be heard on the tape recordings instructing Mr. Blalock on how to use the heroin and asking Mr. Blalock to help him sell drugs. The Defendant's reliance on <u>Woods</u> is misplaced.

Turning to the second factor of Rule 14(b)(1), a primary issue of any severance case is whether the evidence of one offense would be admissible in the trial of the other if the two offenses remained severed. <u>Garrett</u>, 331 S.W.3d at 402. Put another way, a severance motion is essentially "'a question of evidentiary relevance.'" <u>Id.</u> (quoting <u>Spicer</u>, 12 S.W.3d at 445). In order to determine whether "evidence of one [offense] would be admissible in the trial of the other," a trial court, in essence, must determine whether proof of a defendant's alleged bad act may be admitted in his trial for another alleged bad act. <u>See</u> <u>State v. Dotson</u>, 254 S.W.3d 378, 387 (Tenn. 2008). Thus, this determination implicates Tennessee Rule of Evidence 404(b), which excludes evidence of "other crimes, wrongs, or acts" committed by the defendant when offered only to show the defendant's propensity to commit the crime charged. This is because such evidence lacks relevance and invites the finder of fact to infer guilt from propensity. <u>Garrett</u>, 331 S.W.3d at 402-03. However, evidence of prior bad acts may be admissible for other purposes, such as "to show identity, guilty knowledge, intent, motive, to rebut a defense of mistake or accident, or to establish some other relevant issue." <u>Moore</u>, 6 S.W.3d at 239 n.5 (quoting <u>State v. Hallock</u>, 875 S.W.2d 285, 292 (Tenn. Crim. App. 1993)).

The trial court found that the evidence of each set of the offenses would have been admissible in the trials of the others if the three sets were severed because the other drug transactions would be relevant and probative as to "show the lack of any mistake, to show motive, to show intent, and the identity of this defendant." In this case, identity was not an issue. Instead, the Defendant's main argument at trial was that he did not intend to sell or deliver the heroin and that the transactions were merely casual exchanges with no preset plan or arrangement. One of the elements of the crime of sale or delivery of a controlled substance is that the Defendant did so "knowingly." <u>See</u> Tenn. Code Ann. § 39-17-417(a).

<u>State v. Steve Edward Houston</u>, No. 01C01-9711-CC-00510, 1998 WL 749414 (Tenn. Crim. App. Oct. 28, 1998), presented a similar factual scenario. In <u>Houston</u>, the defendant did not "contest the fact that he sold crack cocaine to the State's agents[,]" but instead, defended the charges "upon grounds that his sales of cocaine were 'casual exchange' rather than a designed sale as contemplated by Tenn[essee] Code Ann[otated]

-12-

[section] 39-17-417(a)(3)." 1998 WL 749414, at *5. This court determined that "the evidence of the other counts was relevant" because "[e]ach of the transactions were closely related with a distinctive design common among the four occurrences." Id. The Houston court continued, "the evidence of one offense would be admissible upon the trial of the others" to show intent and guilty knowledge, and "[t]he probative value of the evidence clearly outweighs the danger of unfair prejudice." Id.; see Maliani, 2013 WL 3982156, at *13 (agreeing with the trial court that proof of two separate drug transactions was relevant to the other to prove identity, motive, and guilty knowledge because the defendant argued at trial that he merely "stood there, not doing anything" during the drug transactions and the State offered the evidence to show that the defendant had knowledge that a drug transaction was occurring, that he acted as a look-out, and that he was the source of the drugs exchanged); State v. Wayne Hymes Richards, a/k/a Pete Richards, No. 03C01-9503-CR-00102, 1996 WL 384897, at *3 (Tenn. Crim. App. July 8, 1996) (holding that severance was not warranted on two separate charges of delivery of marijuana, where, "[g]iven that the two offenses were so similar, evidence of the defendant's participation in each offense was probative of both his identity and his guilty knowledge as to the other offense").

The Defendant also contends that he was unfairly prejudiced by the introduction of the school zone evidence pertaining to Counts 1 and 2 where the subsequent transactions did not include school zones. While the record contains no ruling by the trial court with respect to whether the probative value of the evidence outweighed its prejudicial effect, our review of the transcript of the trial convinces us that the probative value of each set of offenses outweighed any danger of unfair prejudice by admission of the evidence. See, e.g., State v. Chris Smith, No. 03C01-9807-CR-00259, 1999 WL 619042, at *2 (Tenn. Crim. App. Aug. 17, 1999) (concluding that, although the trial court did not make findings as required by Tennessee Rule of Evidence 404(b), the defendant was entitled to no relief); Richards, 1996 WL 384897, at *3 ("While the record contains no ruling by the trial court with respect to this issue, our review of the transcript of the trial convinces us that the probative value of each offense with respect to the defendant's identity and state of mind outweighed any danger of unfair prejudice."). In this case, the facts of each transaction were alike except for the date. The Defendant's actions in each set of offenses were extremely probative of intent, motive, guilty knowledge, and lack of mistake, and established a common scheme or plan. The drug-free school zone enhancement is strict liability in nature, meaning that the seller does not have to have any knowledge of the school's location relative to the drug deal. See Tenn. Code Ann. § 39-17-432(b); State v. Smith, 48 S.W.3d 159, 169 (Tenn. Crim. App. 2000). We agree with the State that "there is no reason to believe the jury convicted [the] Defendant of selling [and delivering] drugs, as opposed to casually exchanging them, just because one of the sales occurred in close proximity to a school." We conclude that both prongs of the test

under Rule 14(b) are met, and the trial court did not abuse its discretion by denying the Defendant's motion to sever the three separate drugs deals.

Additionally, the Defendant has not established that he has been clearly prejudiced by the consolidation of these offenses. "On appeal, a denial of the severance will not be reversed unless it appears that the defendant was clearly prejudiced." State v. Barber, 753 S.W.2d 659, 671 (Tenn. 1988); Mosley, 1993 WL 345542, at *4. There was overwhelming evidence of guilt with respect to the three drug deals, which we will discuss in more detail later in this opinion. See Moore, 6 S.W.3d at 242-43 (noting that "the line between harmless and prejudicial error is in direct proportion to the degree . . . by which proof exceeds the standard required to convict" and holding that denial of motion to sever was harmless error where "the evidence presented was more than sufficient for conviction"). Accordingly, even if the trial court erred by denying the Defendant's motion to sever, such error would ultimately have been harmless. Id. at 242 (stating that "the defendant must show that the error probably affected the judgment before reversal is appropriate").

## II. Sufficiency of the Evidence

The Defendant challenges the sufficiency of the evidence supporting each heroin transaction, arguing that the evidence established merely a casual exchange as opposed to a sale or delivery.[5] He also submitted that the proof did not support the school zone enhancement. The State insists that the evidence was sufficient to support the convictions.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The standard of proof is the same whether the evidence is direct

---

[5] The Defendant does not challenge his marijuana conviction on appeal.

or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

The Defendant was convicted of the sale and delivery of heroin, in violation of Tennessee Code Annotated section 39-17-417(a)(2) and (3), which makes it a crime to knowingly sell or deliver a controlled substance. "[A] person . . . acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." Tenn. Code Ann. § 39-11-302(b). Heroin is a Schedule I controlled substance. Tenn. Code Ann. § 39-17-406(c)(11). A violation of Tennessee Code Annotated section 39-17-417(a)(2) or (3) involving heroin is a Class B felony. Tenn. Code Ann. § 39-17-417(b). An enhanced criminal penalty is imposed if the drug transaction occurs within 1000 feet of a drug-free school zone. See Tenn. Code Ann. § 39-17-432. Specifically, if a violation of Tennessee Code Annotated section 39-17-417 occurs "on the grounds or facilities of any school or within one thousand feet (1000') of the real property that comprises a public or private elementary school, middle school, [or] secondary school, . . . [the offender] shall be punished one classification higher than is provided[.]" Tenn. Code Ann. § 39-17-432(b)(1).

## A. Casual Exchange

The Defendant argues that the evidence does not prove beyond a reasonable doubt that the transactions in this case were felonious deliveries or sales rather than casual exchanges. Specifically, Defendant asserts that the following facts "are inconsistent with a drug dealer selling and delivering a controlled substance": all three of the drug deals were initiated by Det. Turner and Mr. Blalock and included numerous phone calls to establish the locations and times of the meetings; the Defendant "had to travel out of the county to obtain the heroin" before exchanging it; the Defendant was always accompanied by Ms. Arwood; "the small personal use quantity of the heroin"; and on one occasion, the Defendant tried to get Mr. Blalock "to front the money" for the heroin purchase. The State counters that the evidence is sufficient to support the Defendant's convictions because the "Defendant and [Mr. Blalock] made arrangements for the sale of drugs prior to the actual exchange in every transaction in this case; each time they agreed on a meeting place, subsequently met at the agreed-upon location, and then exchanged money for drugs."

-15-

The offense of casual exchange is defined by Tennessee Code Annotated Section 39-17-418(a), which provides: "It is an offense for a person to knowingly possess or casually exchange a controlled substance, unless the substance was obtained directly from, or pursuant to, a valid prescription or order of a practitioner while acting in the course of professional practice." Additionally, the inference of casual exchange is located in the second sentence of Tennessee Code Annotated section 39-17-419:

> It may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing. It may be inferred from circumstances indicating a casual exchange among individuals of a small amount of a controlled substance or substances that the controlled substance or substances so exchanged were possessed not with the purpose of selling or otherwise dispensing in violation of the provisions of § 39-17-417(a). The inferences shall be transmitted to the jury by the trial judge's charge, and the jury will consider the inferences along with the nature of the substance possessed when affixing the penalty.

An exchange means "to part with, give or transfer consideration of something received as an equivalent," and the term casual means "without design." State v. Helton, 507 S.W.2d 117, 120 (Tenn. 1974). This court has concluded that the offense of casual exchange "contemplates a spontaneous passing of a small amount of drugs, for instance, at a party. Money may or may not be involved." State v. Copeland, 983 S.W.2d 703, 708 (Tenn. Crim. App. 1998). A transaction will not be deemed a casual exchange if there was a design or previous plan to make the exchange. State v. Carey, 914 S.W.2d 93, 96 (Tenn. Crim. App. 1995); Loveday v. State, 546 S.W.2d 822, 826 (Tenn. Crim. App. 1976).

Whether a transfer is a casual exchange is to be determined from all facts and circumstances of the case. Helton, 507 S.W.2d at 121.

> Facts and circumstances indicating that the transaction is not a casual exchange include a lack of evidence that the defendant gave the drugs to the buyer out of friendship or as a friendly gesture, no evidence reflecting anything other than a pecuniary motive for the transfer of the drugs, no prior relationship between the defendant and the buyer, and no reason for the defendant and the buyer to be together, other than for the buyer to purchase drugs.

State v. Bernard Miguel Wallace, No. W2004-02124-CCA-R3-CD, 2006 WL 16315, at *4 (Tenn. Crim. App. Jan. 3, 2006) (internal citations omitted) (quoting State v. Donald

L. Haynes, No. E2000-00672-CCA-R3-CD, 2001 WL 416729, at *4 (Tenn. Crim. App. Apr. 24, 2001)).

Here, the record contains no evidence that the Defendant was giving the drugs to Mr. Blalock out of friendship or as a friendly gesture; to the contrary, the evidence shows that the Defendant made the deals solely for the purpose of monetary gain. The Defendant solicited Mr. Blalock at a Sunoco gas station, asking Mr. Blalock what type of drugs he was using at the time, and the men exchanged telephone numbers. According to Mr. Blalock, he did not socialize with the Defendant prior to this meeting nor during the ongoing narcotics investigation. There was little to no interaction between the Defendant and Mr. Blalock outside of the actual drug transactions. Mr. Blalock contacted the Defendant for the purpose of buying drugs, and the record shows that the Defendant perceived Mr. Blalock's requests for heroin as ones of business and not friendship.

Regarding the details of the transactions, Mr. Blalock and the Defendant arranged a meeting place, and their conversations were confined to the particulars of the drug deals. The Defendant exchanged heroin for money on three different occasions within a one-week period. The amount of heroin, the price, and the meeting places were clearly established prior to each transaction. For example, Mr. Blalock attempted, although unsuccessfully, to negotiate the price of the heroin. Moreover, Det. Turner testified that, in his experience with illegal drug transactions, drug dealers did not carry large amounts of drugs on their person when making a sale or delivery. Nonetheless, Mr. Blalock testified that he saw additional bags of heroin in the Defendant's lap during the third heroin transaction. Additionally, the Defendant instructed Mr. Blalock on how to inject the heroin and tried to get Mr. Blalock to help sell the Defendant's drugs. Despite the small amount of drugs and money involved in each drug buy, the transactions were not ones without design.

The trial judge properly instructed the jury on the offense of sale and delivery of a Schedule I controlled substance and on the lesser-included offense of casual exchange of a controlled substance, including the casual exchange inference. Notwithstanding the Defendant's argument that the transactions were more properly seen as casual exchanges rather than as felonious sales or deliveries, the jury, acting in its purview, reviewed the evidence and found the Defendant guilty beyond a reasonable doubt of selling and delivering heroin on three occasions. The evidence, viewed in the light most favorable to the State, was more than sufficient to support the Defendant's convictions. See State v. Ziberia Marico Carero, No. E2015-00140-CCA-R3-CD, 2015 WL 9412836 (Tenn. Crim. App. Dec. 22, 2015) ("Although [d]efendant claims that the transaction was a casual exchange, the jury could conclude from the evidence, particularly from [d]efendant's action of adding additional rocks to the bag of cocaine when [the cooperating individual] complained that [d]efendant was trying to provide less than the drugs were worth, that he

-17-

knowingly delivered cocaine . . . as part of a drug sale rather than a casual exchange. Moreover, [the cooperating individual] and [d]efendant made plans for the drug buy in advance and had agreed on a purchase price.); State v. Jason Lyles, No. M2013-02618-CCA-R3-CD, 2015 WL 3533719, at *5 (Tenn. Crim. App. June 5, 2015) (holding that the offense of casual exchange did not contemplate the type of transactions established by the evidence, which were for pecuniary gain; the amount of cocaine, the price, and the meeting places were clearly established prior to each transaction; there was little to no interaction between the defendant and the cooperating individual outside of the actual drug transactions, and a detective testified that "the locations of transactions were often changed during the course of the transaction" (citing State v. Michael Moore, No. 02C01-9705-CR-00180, 1997 WL 703343, at *1 (Tenn. Crim. App. Nov. 13, 1997) (noting that the evidence at trial illustrated that defendant was acting with a "definite design" and for pecuniary gain); State v. David Humphrey, No. 01C01-9404-CR-00134, 1995 WL 50039, at *2 (Tenn. Crim. App. Feb. 8, 1995) (concluding that evidence that a cooperating individual made two fifty-dollar purchases of cocaine from the defendant established a "designed sale"))).

Moreover, the Defendant seems to imply that, because he was only found guilty in Count 3 of casually exchanging 5.08 grams of marijuana under a similar factual scenario, those same facts could not be used to support convictions for selling and delivering heroin. However, given the amount of marijuana exchanged, the State had no choice but to charge the Defendant with casual exchange in Count 3 because Tennessee Code Annotated section 39-17-418(b) specifically provides that the distribution of less than one-half ounce of marijuana (or 14.175 grams) is a casual exchange. The State explained as much to the jury in its closing argument. The Defendant's casual exchange conviction has no impact on his guilt of the selling and delivering offenses.

### B. School Property

Next, the Defendant contends that the proof did not establish that the September 5, 2012 drug transaction occurred within 1000 feet of the real property comprising a school. Specifically, the Defendant argues that the "evidence demonstrate[s] that the real property physically capable of comprising a public elementary school was more than 1000 feet from where the September 5, 2012 transaction took place[,]" noting that the drug deal occurred outside of the school's gate. While the Defendant does not challenge Ms. Whaley's expert qualifications, he does submit that her qualifications "may have bearing as it relates to sufficiency of the evidence" in Counts 1 and 2. The State contends that the evidence sufficiently established that the transaction occurred within a drug-free school zone.

Tennessee Code Annotated section 39-17-432 plainly and unambiguously states that the Act is intended "to serve as a deterrent" in order "to create drug-free zones for

the purpose of providing vulnerable persons in this state an environment in which they can learn, play and enjoy themselves without the distractions and dangers that are incident to the occurrence of illegal drug activities" by imposing "enhanced and mandatory minimum sentences." Tenn. Code Ann. § 39-17-432(a). The State is not required to prove that the defendant knew that he was committing an offense within 1000 feet of a school, nor even that school was in session at the time of the offense. Smith, 48 S.W.3d at 169. A defendant may be convicted under the statute if he or she was merely traveling through the school zone while in possession of controlled substances, even if the sale occurred elsewhere. See State v. Vasques, 221 S.W.3d 514, 523 (Tenn. 2007). This court has explained the rationale for this rule:

> [R]egardless of a defendant's intent to distribute drugs within a school zone: "the mere presence of substantial quantities of drugs increases the risk of gunfire and other violence . . . . In addition, a person possessing drugs may abandon them while fleeing from the police . . . . The drugs may also be lost or stolen near a school and may then find their way into students' hands."

Smith, 48 S.W.3d at 169 (quoting United States v. Rodriguez, 961 F.2d 1089, 1094 (3d Cir. 1992)); see also State v. Arturo Jaimes-Garcia, No. M2009-00891-CCA-R3-CD, 2010 WL 5343286, at *14 (Tenn. Crim. App. Dec. 22, 2010).

In the case herein, the original meeting location was Kroger; however, the Defendant was having vehicle trouble while parked at the Clarion Inn. Mr. Blalock was headed towards the Clarion Inn, when the Ms. Arwood telephoned him and asked him to meet at the Taco Bell. Cattlesburg Elementary School was to the northwest of the restaurant. Both Det. Turner and Agt. McNamara observed the exact location that the drug deal took place in the Taco Bell parking lot. Det. Turner, using a measuring wheel, physically measured the distance from the location of the drug transaction to the school's boundaries. Det. Turner marked the distance of 1000 feet with cone number six on an aerial map. According to Det. Turner, this location "was pretty much right at the intersection of United Boulevard and the entrance to the school."

Ms. Whaley, the director of Sevier County GIS, testified about the maps she created showing the area where the transaction occurred and averred that they accurately reflected how the property looked in 2012. According to Ms. Whaley's testimony, the school board owned two tracts of land—the initial tract of land being the school and school's grounds (Tract 3), and the second parcel was a right-of-way that was later deeded to the school board and was the primary method of ingress and egress from the school, including the route travelled by school buses. The matter of Ms. Whaley's testimony was submitted to the jury under the appropriate instruction regarding expert witnesses, and the jury heard her testimony as to her qualifications and were

appropriately instructed that it was in their discretion the weight and credibility to assign to her testimony.

SPD school resource officer Tim Russell testified that he routinely patrolled the school's grounds, including the right-of-way, which parcel was even closer to the Taco Bell parking lot than Tract 3. He also testified that the school board maintained the right-of-way. According Ofc. Russell, when considering ownership of the school's right-of-way, the drug deal took place within approximately 150 feet from the school property line. Moreover, the school's sign was posted on the right-of-way and was approximately 250 feet from the drug buy's location. Regardless, much ado has been made about the right-of-way and whether that parcel comprises the real property of an elementary school for purposes of the drug-free school zone statute. However, the placement of cone six (1000 feet from the sale) was inside the boundaries of Tract 3, the initial tract of land deeded to the school board comprising the school and its grounds. The evidence reflecting the ownership of the right-of-way was superfluous and unnecessary to establish that the drug deal took place within 1000 feet of the real property comprising Cattlesburg Elementary School.

The Defendant also takes issue with the location of the gate, contending that only the grounds inside of the gate comprised the real property of Cattlesburg Elementary School and noting that cone six's location was outside of the gate. Ofc. Russell testified that the "gate across the driveway" was merely used when the school was on "full lockdown." We agree with the State that the Defendant has not provided us with any authority, and we know of none, that real property comprising an elementary school applies to only portions inside a gate and not the property as a whole. We believe to so hold would be contrary to the intent stated in the statute. Cf. Vasques, 221 S.W.3d at 523 (rejecting defendant's argument that simply traveling through a school zone is not enough to apply the provisions of the Drug-Free School Zone Act); State v. Vernon Elliot Lockhart, No. M2013-01275-CCA-R3-CD, 2015 WL 5244672, at *42 (Tenn. Crim. App. Sept. 8, 2015) (applying school-zone enhancement even when a defendant was simply traveling on an interstate and drove through a school zone), perm. app. denied (Tenn. Jan. 20, 2016).

The jury determined that the State proved beyond a reasonable doubt that the transaction occurred within 1000 feet of Cattlesburg Elementary School. The evidence was sufficient for a rational trier of fact to make this determination. As such, the Defendant is not entitled to relief on this issue.

*III. Sentencing*

The Defendant challenges multiple aspects of the trial court's sentencing determination: (1) that the trial court improperly sentenced him as a Range II, multiple

-20-

offender; (2) that the trial court imposed an excessive sentence by sentencing him to maximum, consecutive sentences; and (3) that the trial court erred in denying his motion for reduction of his overall sentence. Again, we deal with each issue one at a time.

## A. Range Classification

First, the Defendant argues that the trial court erred by sentencing him to an offender classification for which he was not lawfully noticed by the State. Specifically, the Defendant submits that the State only provided notice that it sought to sentence him as a career offender, and when the State failed to establish the necessary convictions for that range, the trial court was precluded from considering any other status beyond that of a Range I, standard offender. The State responds that the trial court properly sentenced the Defendant as Range II, multiple offender.

Tennessee Code Annotated section 40-35-202(a) provides that if the State believes that a defendant's sentence should be enhanced, it "shall file a statement thereof with the court and defense counsel not less than ten (10) days before trial or acceptance of a guilty plea." See also Tenn. R. Crim. P. 12.3(a) ("Written statements of the district attorney giving notice that the defendant should be sentenced to an enhanced punishment . . . shall be filed not less than ten (10) days prior to trial. If the notice is filed later than this time, the trial judge shall grant the defendant, upon motion, a reasonable continuance of the trial."). This statement "must set forth the nature of the prior felony convictions, the dates of the convictions and the identity of the courts of the convictions." Id. The purpose of the statement is to provide notice to a defendant that he is exposed to enhanced sentencing beyond the standard range, to encourage plea bargain agreements, to help the defendant make an educated decision before entering a plea of guilt, and to assist with trial strategy. State v. Livingston, 197 S.W.3d 710, 712 (Tenn. 2006) (citing State v. Adams, 788 S.W.2d 557, 559 (Tenn. 1990); State v. Taylor, 63 S.W.3d 400, 412 (Tenn. Crim. App. 2001)).

Regarding the accuracy of the information on the notice of intent, the Tennessee Supreme Court has stated: "When a detail of the required information is omitted or incorrect, the inquiry should be whether the notice was materially misleading. Where an ambiguity or contradiction appears on the face of the notice, defendant has a duty to inquire further." Adams, 788 S.W.2d at 558. "While 'perfect' notice is not required, . . . some notice meeting the minimal requirements of the statute be given." Livingston, 197 S.W.3d at 713. At a minimum, the statute requires that the State file: "(1) written notice, (2) clearly expressing the State's intention to seek sentencing outside of the standard offender range, (3) setting forth the nature of the prior felony conviction, the dates of the convictions, and the identity of the courts of the convictions." Id. at 713-14 (internal footnote omitted). Ultimately, "when the State has substantially complied with [s]ection

40-35-202(a), an accused . . . must show prejudice to obtain relief." Adams, 788 S.W.2d at 559.

Here, the State filed a notice of intent to seek enhanced punishment pursuant to Tennessee Code Annotated section 40-35-202(a) on June 19, 2013, which was more than a year before the trial and well before the ten-day requirement contained in the statute. See Tenn. Code Ann. § 40-35-202(a). The State asserted that the Defendant "should be sentenced as a [c]areer [o]ffender" and listed twelve prior felony convictions in the notice of intent to seek enhanced punishment:

1. Aggravated burglary, a Class C felony, and theft of property valued at $1000 or more, a Class D felony; case number 8688, Jefferson County, Tennessee; offense date January 6, 2006; and sentence imposed date September 25, 2006, three years to the TDOC;

2. Aggravated burglary, a Class C felony; case number 11322 count 1, Sevier County, Tennessee; offense date January 5, 2006, and sentence imposed date April 4, 2006, three years to the TDOC;

3. Aggravated burglary, a Class C felony; case number 11322 count 2, Sevier County, Tennessee; offense date January 5, 2006, and sentence imposed date April 4, 2006, three years to the TDOC;

4. Aggravated burglary, a Class C felony; case number 11322 count 3, Sevier County, Tennessee; offense date January 5, 2006, and sentence imposed date April 4, 2006, three years to the TDOC;

5. Aggravated burglary, a Class C felony; case number 11322 count 4, Sevier County, Tennessee; offense date January 5, 2006, and sentence imposed date April 4, 2006, three years to the TDOC;

6. Aggravated burglary, a Class C felony, theft of property valued at $1000 or more, a Class D felony, and aggravated assault, a Class C felony; case number 10093, Sevier County, Tennessee; offense date October 7, 2003; and sentence imposed date April 12, 2005, three years to the TDOC;

7. Aggravated burglary, a Class C felony, and theft of property valued at $1000 or more, a Class D felony; case number 10199, Sevier County, Tennessee; offense date December 15, 2003; and sentence imposed date April 12, 2005, three years to the TDOC; and

8. Sale of oxycodone, a Class C felony; case number 9784, Sevier County, Tennessee; offense date December 11, 2002; and sentence imposed date March 30, 2004, four years to the TDOC.

Certified judgment forms reflecting ten of the twelve convictions listed above were made exhibits to the sentencing hearing. Two convictions, the aggravated burglaries in case numbers 10093 and 10199, were never mentioned by the State at the sentencing hearing.[6] The State did introduce an additional certified judgment in case number 11322 for count 6—theft of property valued at $1000 or more, a Class D felony; offense date January 5, 2006; with a sentence of three years to the TDOC (no sentence imposed date reflected). The Defendant objected to using this last referenced judgment for range classification purposes because it was not contained in the State's notice. The State responded that it was not relying on this judgment document for range enhancement purposes but merely as "evidence of other criminal conduct"; the Defendant withdrew his objection.

The Defendant stands convicted of two Class A felonies and four Class B felonies. As relevant here, a career offender is a defendant who has "[a]ny combination of six (6) or more Class A, B or C prior felony convictions, and the defendant's conviction offense is a Class A, B or C felony[.]" Tenn. Code Ann. § 40-35-108(a)(1). A persistent offender is a defendant who has received "[a]ny combination of five (5) or more prior felony convictions within the conviction class or higher or within the next two (2) lower felony classes, where applicable[.]" Tenn. Code Ann. § 40-35-107(a)(1). A defendant is classified as a Range II, multiple offender when the defendant has received "[a] minimum of two (2) but not more than four (4) prior felony convictions within the conviction class, a higher class, or within the next two (2) lower felony classes, where applicable[.]" Tenn. Code Ann. § 40-35-106(a)(1). In order to label a defendant as a multiple, persistent, or career offender, the trial court has to determine beyond a reasonable doubt that the defendant has the requisite prior felonies. Tenn. Code Ann. §§ 40-35-106(c), -107(c), -108(c).

Referencing the relevant temporal code sections, each range classification included the following caveat:

> Convictions for multiple felonies committed as part of a single course of conduct within twenty-four (24) hours constitute one (1) conviction for the purpose of determining prior convictions; however, acts resulting in bodily injury or threatened bodily injury to the victim or victims shall not be construed to be a single course of conduct[.]

---

[6] Photocopies of certified judgments for both of these aggravated burglaries were attached to the enhancement notice filed by the State.

Tenn. Code Ann. §§ 40-35-106(b)(4), -107(b)(4), -108(b)(4) (1997).[7] This is commonly known as the twenty-four-hour merger rule. The legislature amended the statute in 2009 to also exclude aggravated burglary from the twenty-four-hour merger rule, but the aggravated burglaries in this case occurred before 2009. See Tenn. Code Ann. §§ 40-35-106(b)(4), -107(b)(4), -108(b)(4) (2010). The Compiler's Notes to the amended versions of each section make it clear that only aggravated burglaries "occurring on or after August 17, 2009, shall count as prior convictions for the purposes enumerated in this act." Tenn. Code Ann. §§ 40-35-106, Compiler's Notes; -107, Compiler's Notes; -108, Compiler's Notes; see also State v. Kenneth Edward Watts, No. E2010-00553-CCA-R3-CD, 2011 WL 5517000, at *6 (Tenn. Crim. App. Nov. 8, 2011) (noting this change to the twenty-four-hour merger rule).

Additionally, we note that the Defendant's offenses in case numbers 8688 and 11322 were committed on consecutive days, January 5 and 6 of 2006. Various panels of this court have held "that it is the responsibility of the defendant to establish that offenses which were committed on consecutive days occurred within twenty-four hours of each other." State v. Gregory L. Sain, No. M2006-00865-CCA-R3-CD, 2008 WL 624924, at *12 (Tenn. Crim. App. Mar. 6, 2008) (quoting State v. Freddie T. Inman, Jr., No. W2004-02371-CCA-R3-CD, 2005 WL 729149, at *10 (Tenn. Crim. App. Mar. 30, 2005)) (internal quotation marks omitted); see also State v. John Roy Polly, No. M1999-00278-CCA-R3-CD, 2000 WL 1606586, at *3 (Tenn. Crim. App. Oct. 27, 2000) (holding that "where the defendant seeks the application of the twenty-four hour rule and the relevant convictions occur on different days, it is the defendant's responsibility to demonstrate that the two offenses occurred within twenty-four hours of each other"); Watts, 2011 WL 5517000, at *7 (citing John Roy Polly with approval). In addition, we previously have held that "[t]he date of adjudication or the entry of judgment is irrelevant when applying the twenty-four-hour merger rule." State v. David Anthony Lee, No. E1999-02537-CCA-R3-CD, 2000 WL 1478570, at *2 (Tenn. Crim. App. Oct. 6, 2000).

At the sentencing hearing, the Defendant argued that the four aggravated burglary convictions comprising case number 11322 should be merged because they occurred on the same date January 5, 2006, and were therefore subject to the twenty-four-hour merger rule under the statute applicable to the Defendant. The Defendant also asserted that case numbers 8688 and 11322 occurred within twenty-four hours of each other on January 5

---

[7] In 2005, these sections were amended to provide, "Except for convictions for which the statutory elements include serious bodily injury, bodily injury, threatened serious bodily injury, or threatened bodily injury to the victim or victims, convictions for multiple felonies committed within the same twenty-four-hour period constitute one (1) conviction for the purpose of determining prior convictions." Tenn. Code Ann. §§ 40-35-106(b)(4), -107(b)(4), -108(b)(4) (2005).

and 6 of 2006 and, therefore, should merge as a single course of conduct.[8]  The State conceded that it had not considered the old law regarding merger of aggravated burglaries and agreed that the four aggravated burglaries in case number 11322 should merge. Thereafter, the trial court merged the aggravated burglaries in case number 11322, but refused to merge cases 8688 and 11322.  Accordingly, the trial court ruled that the State had established four C felonies in case numbers 8688, 11322, 10093,[9] and 9784, and sentenced the Defendant as Range II, multiple offender.

Neither party challenges the trial court's range determination on appeal as it pertains to the number of convictions found; the issue presented is one of notice.[10]  All of the convictions utilized by the trial court were included in the State's enhancement notice and were supported by certified copies of judgments of conviction introduced at the sentencing.  The information contained in the notice was accurate, setting forth the nature of the prior felony convictions, the dates of the convictions, and the identity of the courts of the convictions.  The Defendant does not dispute these facts; he simply argues that the notice of the higher range classification does not incorporate the lesser classification.  We disagree.

Here, the notice filed by the State gave "fair notice to accused that he is exposed to other than standard sentencing."  Adams, 788 S.W.2d at 559.  Furthermore, the Defendant was not misled or surprised by the State's seeking enhanced punishment. Thus, the notice accomplished the purpose of the statute.  See State v. Chase, 873 S.W.2d

---

[8]  Again, it is the Defendant's responsibility to establish that offenses which were committed on consecutive days and occurred within twenty-four hours of each other.  The Defendant's two cases occurred on consecutive days in two different counties.  The record is devoid of any proof, other than the Defendant's bald assertion at the sentencing hearing, to support a claim for merger under the twenty-four-hour rule.  See, e.g., Watts, 2011 WL 5517000, at *7 (concluding same); State v. Cory Shane Rollins, No. E2008-01407-CCA-R3-CD, 2010 WL 342653, at *15 (Tenn. Crim. App. Knoxville, Feb. 1, 2010) ("The [d]efendant proved that he committed the offenses on two consecutive days, but he did not establish a time-frame proving that the offenses occurred within twenty-four hours of each other.").

[9]  The State only presented evidence of the aggravated assault conviction in case number 10093. However, we note that this aggravated assault conviction could have been separated from the aggravated burglary in that same case because aggravated assault is an offense either "resulting in bodily injury or threaten[ing] bodily injury[.]"  See Tenn. Code Ann. §§ 40-35-106(b)(4), -107(b)(4), -108(b)(4) (1997). Nonetheless, the State never entered a judgment or referenced the aggravated burglary conviction in case 10093 at the sentencing hearing, although a certified copy was attached to the enhancement notice.

[10]  Based upon the evidence presented by the State at the sentencing hearing, we cannot find any error with the trial court's decision regarding the Defendant's range classification.  However, we note that had the State introduced proof of the two aggravated burglary convictions in case numbers 10093 and 10199, the Defendant would have qualified as a career offender with six Class C felony convictions.  We make this statement in order to properly put into focus the Defendant's argument that his sentence was excessive, which we will address in the next section of this opinion.

7, 9 (Tenn. Crim. App. 1993). Based on his prior convictions presented by the State at the sentencing hearing, the trial court sentenced the Defendant within the appropriate range, which was actually a lesser range than that listed on the notice of intent to seek enhanced punishment. The notice in this case was clearly sufficient under Tennessee Code Annotated section 40-35-202(a). See, e.g., State v. Taylor, 63 S.W.3d 400, 412-13 (Tenn. Crim. App. 2001) (holding that "Notice of Enhancement" document, which listed the defendant's seven prior convictions, but did not specify which range applied, nonetheless, substantially complied with notice requirements); State v. Timothy W. Sparrow, No. M2012-00532-CCA-R3-CD, 2013 WL 1089098, at *26-27 (Tenn. Crim. App. Mar. 14, 2013) (finding substantial compliance where an "all-purpose notice" contained the defendant's entire criminal history even though the notice did not identify range); State v. James Allen Gooch, Jr., No. M2011-01135-CCA-R3-CD, 2012 WL 4358195, at *11-14 (Tenn. Crim. App. Sept. 25, 2012) (finding substantial compliance where the notice identified the range as a career offender, even though the listed prior convictions only supported multiple offender status, but an additional prior conviction presented at the sentencing hearing established persistent offender range). Accordingly, we conclude that the trial court did not err in sentencing the Defendant as a Range, II multiple offender.

*B. Excessive Sentence*

After determining that the Defendant was a Range II, multiple offender, the trial court imposed the maximum term of forty years for the Class A felony conviction and twenty years for each Class B felony conviction. See Tenn. Code Ann. § 40-35-112(b). The trial court merged the three heroin delivery convictions into the corresponding heroin sale convictions and aligned these three sentences consecutively, resulting in a total effective sentence of eighty years' incarceration.[11] In so concluding, the trial court offered the following rationale in support of its sentencing decision:

> In this case, the [c]ourt has considered the pre-sentence investigation report, the exhibits, the proof introduced at trial, the records of previous convictions, the principles of sentencing under the sentencing laws, statements and arguments of counsel, and the entire record in this cause. From all of which the court finds as follows. . . .
>
> . . . .
> The [c]ourt . . . finds that [the Defendant's] records of conviction as shown by the certified copies of convictions in Exhibits 2 through 11, and as shown in the pre-sentence investigation report, is extensive and that the

---

[11] The trial court imposed a concurrent sentence of eleven months and twenty-nine days for the misdemeanor casual exchange conviction. Like the sufficiency of the evidence supporting this conviction, the Defendant does not challenge the sentence on appeal.

enhancement factor as set out in T.C.A. § 40-35-114(1), that he has numerous criminal convictions in addition to those necessary to establish his range as a multiple offender, and the [c]ourt finds that aggravated enhancing factor.

The [c]ourt further finds that there are no mitigating factors as shown.

The [c]ourt therefore finds that the appropriate sentence for each offense is the maximum penalty for each offense. The [c]ourt further finds by a preponderance of the evidence that these sentences should run consecutively pursuant to T.C.A. § 40-35-115. He is a professional criminal, as shown not only by his extensive criminal record, but the facts at trial show that he was engaging in a continuing criminal enterprise to profit, that is selling of drugs. This substantial criminal record further supports the imposition of consecutive sentences. The State urges that the sale of heroin further qualifies him as a dangerous offender. Certainly the sale of a dangerous drug, such as heroin, coupled with instructions given for intravenous use, as shown at trial, would qualify his conduct as creating a danger to others. The [c]ourt does find that this conduct does make him a dangerous offender. However, [t]he court relies more heavily on the findings that he is a professional criminal with a very extensive criminal record.

The [c]ourt further finds that the consecutive sentences with an aggregate of eighty years is reasonably relat[ed] to the severity of the crimes for which he is convicted when considering his prior record and all the circumstances.

The Defendant argues that the trial court imposed an excessive sentence by sentencing him to the maximum sentence within the range for each felony conviction and by imposing consecutive sentences. The Defendant submits that his overall eighty-year sentence was not consistent with the purposes and principles of the Sentencing Act. The State responds that the trial court appropriately exercised its discretion when sentencing the Defendant for his crimes.

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant

wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b). When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). Moreover, appellate courts may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2007). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

Regarding the length of his various sentences, the Defendant does not contest the trial court's application of enhancement factor (1) or argue that any mitigating factors applied. Instead, the Defendant claims that his terms are excessive under the sentencing considerations outlined in Tennessee Code Annotated sections 40-35-103, 40-35-210, and the principles and purposes codified at Tennessee Code Annotated sections 40-35-102 and 40-35-103. He notes the relatively small amounts of heroin involved in each drug transaction and that he will have to serve one hundred percent of the minimum sentence (i.e., twenty-five years) for the drug-free school zone conviction before being eligible for parole, see Tennessee Code Annotated section 39-17-432(c) (stating that a defendant sentenced for a drug-free school zone violation "shall be required to serve at least the minimum sentence for the defendant's appropriate range of sentence"). Moreover, while discussing his drug-free school zone sentence of forty years, the Defendant states that "[t]he trial court did not state any reason for imposing such an excessive sentence upon [the Defendant]."

In accordance with the broad discretion now afforded a trial court's sentencing decision, "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Bise, 380 S.W.3d at 706. This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. at 709-10. Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," Tennessee Code Annotated section 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," Tennessee Code Annotated section 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," Tennessee Code Annotated section 40-35-103(5). Carter, 254 S.W.3d at 344.

It is clear from the transcript that the trial court, at the outset of the sentencing hearing, followed all necessary sentencing considerations delineated in section 40-35-210. Moreover, the record demonstrates that the Defendant's within-range sentences are

otherwise in compliance with the purposes and principles of sentencing. The trial court relying on the eleven certified copies of conviction entered into evidence and the pre-sentence investigation report, applied factor (1)—that the Defendant had a previous history of criminal convictions, or criminal behavior, in addition to those necessary to establish the appropriate range. See Tenn. Code Ann. § 40-35-114(1). The court found this to be an "aggravated enhancing factor." This was the trial court's rationale.

In an attempt to minimize his criminal history, the Defendant notes that he neither "admitted nor a jury found the criminal histories contained in the [p]resentence [i]nvestigation [r]eport other than the convictions introduced at sentencing in the State's unsuccessful attempt at declaring [the Defendant] a [c]areer [o]ffender[.]" He also states that the "eight convictions introduced by certified copy spanned a period of four years and five of them occurred on January 5, 2006." First, there were eleven certified judgments of conviction entered at the sentencing hearing, not eight, and only two of the Defendant's Class C felony convictions were needed to establish his Range II status. Also, the indictments in case number 11322, entered into evidence by the Defendant, reflected four different victims of his aggravated burglaries. Moreover, there were two other aggravated burglary convictions established by certified copies attached to the range enhancement notice. Finally, the trial court properly relied upon information in the presentence report in making its sentencing determination. It is well established that reliable hearsay, such as a presentence report, is admissible during sentencing. See Tenn. Code Ann. § 40-35-209 ("The rules of evidence shall apply [in sentencing hearings], except that reliable hearsay . . . may be admitted if the opposing party is accorded a fair opportunity to rebut any hearsay evidence so admitted[.]"); State v. Baker, 956 S.W.2d 8, 17 (Tenn. Crim. App. 1997). Importantly, a trial court is required to consider the presentence report before imposing a sentence. Tenn. Code Ann. § 40-35-210(b)(2).

Upon our review of the pre-sentence report, we noticed that the Defendant had a plethora of additional convictions, both misdemeanors and felonies, including traffic offenses and more drug, theft, and assault convictions. He also violated his parole in 2009 and had multiple probation violations. The Defendant began his criminal career at the age of fourteen and was only thirty-five years old at the time the pre-sentence report was ordered in November 2014. In light of the Defendant's criminal history, enhancement factor (1) was more than sufficient to justify the trial court's imposition of the maximum sentences.

The Defendant also challenges the imposition of consecutive sentences, claiming that his overall sentence is excessive under the purposes and principles of sentencing and that "the driving force behind his sentence was to give [the Defendant] the maximum sentence he could receive since he was not a career offender." According to the Defendant, "the trial court gave no particular purpose it was imposing a sentence in

excess of a life sentence of [sixty] years[,]" and the trial court did not provide "articulated reasons" for the imposition of consecutive sentencing allowing for meaningful appellate review.

A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of the seven categories in section 40-35-115(b). Tenn. Code Ann. § 40-35-115(b). "Any one of these grounds is a sufficient basis for the imposition of consecutive sentences." State v. Pollard, 432 S.W.3d 851, 862 (Tenn. 2013) (citing State v. Dickson, 413 S.W.3d 735, 748 (Tenn. 2013)). Additionally, when the imposition of consecutive sentences is based on application of the dangerous offender criterion, the court must also find "that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender." State v. Wilkerson, 905 S.W.2d 938, 939 (Tenn. 1995); see also Pollard, 432 S.W.3d at 863-64; State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

Furthermore, our supreme court has held that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." Pollard, 432 S.W.3d at 860. This court must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." Id. at 861. "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." Id. (citing Tenn. R. Crim. P. 32(c)(1); Bise, 380 S.W.3d at 705). However, when imposing consecutive sentences, the court must still consider the general sentencing principles that each sentence imposed shall be "justly deserved in relation to the seriousness of the offense," "no greater than that deserved for the offense committed," and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. §§ 40-35-102(1), -103(2), -103(4); State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002).

Here, from our review of the transcript, the trial court imposed consecutive sentences based upon three criteria: (1) The Defendant was a professional criminal who had knowingly devoted the Defendant's life to criminal acts as a major source of livelihood; (2) The Defendant was an offender whose record of criminal activity was extensive; and (3) The Defendant was a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high.[12] See Tenn. Code Ann. § 40-35-115(1), (2), (4). The trial

---

[12] Both parties focus on the professional criminal category as the trial court's basis for ordering consecutive sentences. However, we think the trial court's ruling supports a conclusion that it utilized the

court also determined that the aggregate sentence was "reasonably relat[ed] to the severity of the crimes for which he is convicted when considering his prior record and all the circumstances." Contrary to the Defendant's assertion, these are articulated reasons for ordering consecutive sentences and, thus, provide us with a basis for meaningful appellate review. Moreover, the trial court specifically stated that it was relying "more heavily" on the first two criteria rather than the dangerous offender category. Because only one criterion is needed to support the appropriateness of consecutive sentencing, we decline to address the Defendant's classification as a dangerous offender or his argument on appeal in that regard.

The Defendant relies upon State v. Biggs, 482 S.W.3d 923 (Tenn. Crim. App. 2015), in support of his argument that the trial court erred by imposing consecutive service because his effective sentence is not justly deserved based upon the seriousness of the offenses and is not the least severe measure necessary to achieve the purposes for which the sentences were imposed. In Biggs, the defendant pled guilty to four counts of aggravated robbery, during which the defendant displayed a gun and demanded money from employees at various businesses. The defendant also pled guilty to two counts of misdemeanor theft, during which the defendant took bags of potting soil from Walmart and took money from a convenience store's cash register. The defendant pled guilty to attempted aggravated robbery, during which he attempted to take money from another cash register. The cashier closed the register drawer on the defendant's hand; the defendant pulled out a gun; and a struggle ensued. The defendant left the scene without the gun, which was later determined to be a toy. The toy gun was also used in the four aggravated robberies to which the defendant pled guilty. 482 S.W.3d at 925.

The trial court in Biggs determined that the defendant was a Range III, persistent offender based upon the defendant's previous convictions. The court imposed partial consecutive service and ordered two of the defendant's twenty-two-year sentences for aggravated robbery be served consecutively, for an effective forty-four-year sentence to be served at 85%. The trial court imposed consecutive sentences based upon the defendant's having an extensive criminal history and the defendant's serving a sentence on probation at the time he committed the offenses. The defendant had been previously convicted of forgery, evading arrest, theft, casual exchange, possession of cocaine, possession of marijuana, and speeding, and he admitted he was on probation at the time he committed the offenses. Relative to imposing a just and deserved sentence based upon the offense, the trial court noted that full consecutive service was not warranted but that partial consecutive service produced a fair and just sentence. 482 S.W.3d at 926.

On appeal, the Biggs majority concluded that the trial court erred by ordering partial consecutive service. The majority focused, in part, on the circumstances of the

factor that the Defendant possessed an extensive criminal record as well.

-31-

offenses, noting that the robberies were committed with a plastic gun, that none of the victims were injured, and that two victims knew the gun was plastic. The majority also focused on the defendant's age of forty-nine and lack of previous convictions for violent offenses. This court concluded that the sentence was tantamount to a life sentence and that forty-four years was not deserved in relation to the offenses involved and was not the least severe measure necessary to achieve the purposes of sentencing. 482 S.W.3d at 927.

In the present case, however, we conclude that the record does not reflect the trial court abused its discretion by ordering consecutive service. Contrary to the argument presented by the Defendant in his reply brief, there is evidence in the record that he obtained his livelihood almost entirely through criminal activity.[13] The pre-sentence report reflects that the Defendant dropped out of high school after the tenth grade. The Defendant also reported marijuana usage beginning at age sixteen, which escalated to opiates and included a three-hundred-dollar-a-day heroin habit by the time of his incarceration. His status as an affiliate with the "Aryan Nation" was "confirmed" in 2008. The Defendant informed that he resided with his father and that he was employed as a painter with "Cold Springs Paint and Stain," a family-owned business, prior to his incarceration. The only other stated employment was with "Click's Paint and Stain" for $1200 per week from 2004 to 2006.

Turning to the facts of the drug deals in this case, the Defendant solicited Mr. Blalock at a gas station, explained to the Mr. Blalock how to use heroin intravenously, tried to get Mr. Blalock to sell drugs for him, and was seen in possession of multiple small bags of heroin. We conclude that these facts, coupled with the Defendant's criminal history as outlined above, are more than sufficient to support the trial court's application of factors (1) and (2) for consecutive sentencing, i.e., that the Defendant was a professional criminal who knowingly devoted his life to criminal acts as a major source of livelihood[14] and that the Defendant was an offender with an extensive criminal record.

---

[13] In his reply brief, and for the first time, the Defendant argues that this is a case of sentence entrapment because Det. Turner "determined the number of transactions, the amount of each transaction, or both." However, issues raised for the first time in a reply brief are waived. See State v. Walter Francis Fitzpatrick, III, No. E2014-01864-CCA-R3-CD, 2015 WL 5242915, at *8 (Tenn. Crim. App. Sept. 8, 2015), perm. app denied (Tenn. Feb. 18, 2016); State v. Franklin Sanders, No. 02C01-9305-CR-00102, 1994 WL 413465, at *10 (Tenn. Crim. App. Aug. 10, 1994) ("The defendant cannot change issues from his original brief to his reply brief any more than he can change theories from the trial court to the appellate court."), aff'd, 923 S.W.2d 540 (Tenn. 1996); see also Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7); Carruthers v. State, 814 S.W.2d 64, 69 (Tenn. Crim. App. 1991). Consequently, we decline to address this issue.

[14] The Defendant complains that the trial court did not state that he "knowingly devoted his life to criminal acts as a major source of livelihood." However, the trial court did find that the Defendant "was

-32-

A trial court's sentencing determinations are fashioned to the individual offender.  See State v. Austin Dean, Nos. E2015-01217-CCA-R3-CD & E2015-02366-CCA-R3-CD, 2016 WL 5864631, at *6 (Tenn. Crim. App. Oct. 7, 2016) (declining to extend Biggs under the facts presented in that case).  The Defendant's effective eighty-year sentence in this case is supported by the record, and Biggs affords him no relief.

According to the Defendant, "the driving force behind his sentence was to give [the Defendant] the maximum sentence he could receive since he was not a career offender."  As noted above, the Defendant had a sufficient number of convictions to qualify as a career offender, but the State failed to provide all of the necessary documentation at the sentencing hearing.  Also, the Defendant's criminal record is indeed "substantial," as noted by the trial court.  Our review of the sentencing hearing transcript indicates that the trial court considered the evidence, the enhancement and mitigating factors, and the purposes and principles of sentencing prior to imposing consecutive, within-range sentences of confinement in this case.  Therefore, the Defendant has failed to establish that the trial court abused its discretion in sentencing the Defendant to an effective eighty years' incarceration, and he is not entitled to relief.

### C. Motion to Reduce Sentence

On May 5, 2015, the Defendant filed a motion pursuant to Rule 35 of the Tennessee Rules of Criminal Procedure to reduce his overall eighty-year sentence.  In his motion, the Defendant again noted the relatively small amount of heroin involved in the three controlled buys:  "[T]he jury convicted the Defendant of selling a collective amount of heroin[] of 0.19 grams, which equates to 0.0004187829815 pounds."  (Footnote omitted).  He then stated that evidence of these three drug deals "was used by the Knox County District Attorney General's office in coordination and complicity with the Sevier County District Attorney General's office to prosecute [him] on [twelve] separate counts of conspiracy in Knox County," and he attached a copy of the indictment.  The Defendant asserted that he was thereafter convicted in Knox County of conspiring to sell or deliver 150 grams or more of heroin in violation of the drug-free school zone statute and received a sentence of twenty-five years for that conviction.[15]  According to the Defendant, his "individual sentence and collective sentences" amounted to excessive punishment.

---

engaging in a continuing criminal enterprise to profit, that is selling of drugs."  This finding is sufficient to satisfy the trial court's application of the professional criminal criterion.

[15]  However, the judgment form attached as an exhibit to the motion provides that this charge was dismissed or nolle prosecui.  Moreover, the Defendant gives no indication of the concurrent or consecutive nature of this twenty-five-year sentence.

Defense counsel argued the motion to reduce the Defendant's sentence in conjunction with the hearing on the motion for new trial. No additional evidence on the motion to reduce the Defendant's sentence was presented at the hearing. Based solely upon the argument of counsel, the Defendant requested that the trial court reconsider its position "in the interest of justice" and impose a twenty-five-year sentence. In denying the Defendant's motion to reduce his sentence, the trial court reasoned that it considered "just about everything that you can consider" at the sentencing hearing, "including all those things that are required" by statute; recalled that the Defendant had "a horrible criminal history, extensive criminal history, multiple, multiple home burglaries, prior drug cases, crime of violence, aggravated assault"; and held that the sentence was appropriate "under our sentencing law and the facts and circumstances and the background" of the Defendant.

On appeal, the Defendant contends that the trial court erred in denying his Rule 35 motion for reduction of sentence. After setting forth the applicable legal principles governing Rule 35, the Defendant presents his argument in a two-sentence paragraph. He submits,

> For the reasons stated above regarding sentencing at pages 5 through 16, which are specifically incorporated herein by reference as though set out verbatim,[16] [the Defendant's] [eighty-]year sentence for the transfer of 0.19 grams of heroin during three random drug transactions over a seven-day period of time is illogical, unreasonable and exceeds any principle or purpose of the Tennessee Sentencing Reform Act, as amended.

(Footnote added). He concludes that the "trial court abused its discretion in allowing this sentence to stand after [his] Rule 35 motion for reduction of sentence." The State responds that the Defendant "has not provided any proof that his sentence is unjust" and that, therefore, no abuse of discretion occurred.

Tennessee Rule of Criminal Procedure 35 provides that "[t]he trial court may reduce a sentence upon motion filed within 120 days after the date the sentence is imposed or probation is revoked." Tenn. R. Crim. P. 35(a). The rule "does not vest the defendant with a remedy as of right." State v. Elvin Williams, No. M2006-00287-CCA-R3-CO, 2007 WL 551289, at *1 (Tenn. Crim. App. Feb. 27, 2007). According to the Advisory Commission Comments to Rule 35, the "intent of this rule is to allow modifications only in circumstances where an alteration of the sentence may be proper in the interests of justice. The modification permitted by this rule is any modification

---

[16] Pages 5 through 16 deal with the Defendant's various challenges to the trial court's sentencing determination, including his range classification, the length of his individual sentences, and the imposition of consecutive sentencing.

otherwise permitted by law when the judge originally imposed [the] sentence[.]" When the appellate court reviews the denial of relief on a motion to reduce or modify a sentence, the standard is whether the trial court abused its discretion. State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006); State v. Irick, 861 S.W.2d 375, 376 (Tenn. Crim. App. 1993).

The trial court considered the merits of the Defendant's motion and conducted a full review of the matter before denying relief. The record does not establish that the Defendant presented "the trial court with evidence of a change in circumstances sufficient to warrant [reduction of his eighty-year] sentence 'in the interests of justice.'" See State v. Sabrina Howard, No. W2014-02309-CCA-R3-CD, 2015 WL 8334629, at *3 (Tenn. Crim. App. Dec. 9, 2015) (quoting Tenn. R. Crim. P. 35, Advisory Comm'n Cmts). In fact, the Defendant's argument on appeal does not focus on any abuse of discretion by the trial court in denying the motion but rather relates to the trial court's allegedly improper sentencing at the sentencing hearing. This is merely an attempt to relitigate his sentencing issues, which we have already determined to be without merit. Thus, we cannot conclude that the trial court abused its discretion when it denied relief. See, e.g., State v. Kristopher Lee Colbert, No. M2012-00225-CCA-R3-CD, 2012 WL 5543520, at *4 (Tenn. Crim. App. Nov. 9, 2012) (affirming denial of Rule 35 motion under similar circumstances and noting that "the trial court followed proper sentencing procedures," that the defendant's sentence was "in the range of punishment provided for his offenses," and that "the sentence appear[ed] to be consistent with applicable sentencing principles and guidelines"); State v. Tianje R. Johnson, No. M2010-01159-CCA-R3-CD, 2011 WL 5551677, at *7 (Tenn. Crim. App. Nov. 15, 2011) (finding no abuse of discretion in trial court's denial of Rule 35 motion to modify the sentence that advanced the same arguments and evidence submitted at the sentencing hearing).

## CONCLUSION

For the foregoing reasons, we affirm the judgments of the trial court.

_____
D. KELLY THOMAS, JR., JUDGE

-35-